115 P.3d 316 (2005)
PRISON LEGAL NEWS, INC., Petitioner,
v.
DEPARTMENT OF CORRECTIONS, Respondent.
No. 74890-0.
Supreme Court of Washington, En Banc.
Argued October 21, 2004.
Decided July 14, 2005.
*317 William John Crittenden, Patrick Denis Brown, Seattle, for Amicus Curiae Allied Daily Newspapers of Washington Inc., Washington Coalition for Open Government, and *318 Washington Newspaper Publishers Association.
Robert Bertelson Mitchell, Julie Anne Halter, Preston Gates & Ellis LLP, Seattle, for Amicus Curiae American Civil Liberties Union.
Greg Overstreet, Attorney General's Office, Olympia, for Amicus Curiae Coalition for Open Government.
Signe H. Brunstad, Seattle, for Amicus Curiae Coalition for Open Government.
Patricia J. Arthur, Columbia Legal Services, Seattle, for Amicus Curiae Angelo Lambrou and Pro-Family Advocates of Washington.
David C. Fathi, ACLU National Prison Project, Washington DC, Amicus Curiae for Washington Association of Criminal Defense Lawyers.
SANDERS, J.
The diffusion of information and the arraignment of all abuses at the bar of public reason, I deem [one of] the essential principles of our government, and consequently [one of] those which ought to shape its administration.
Thomas Jefferson[1]
¶ 1 We here consider whether identifying information in public records related to medical misconduct investigations in Washington prisons and patient information other than names or identification numbers are exempt from disclosure under the public disclosure act (PDA), chapter 42.17 RCW. We hold that the Department of Corrections (DOC) must release the names of disciplined medical staff and of witnesses. Further, the PDA does not permit DOC to withhold all patient information in a blanket fashion, but DOC must demonstrate that each piece of health care information it seeks to withhold is readily identifiable with a patient. We remand to the trial court for this determination.

FACTS AND PROCEDURAL HISTORY
¶ 2 Paul Wright, a prisoner and editor for Prison Legal News (PLN), made seven requests for documents from DOC under the PDA.
¶ 3 PLN made the first request to DOC on January 21, 2000. PLN requested (1) documents of all disciplinary actions against DOC medical providers by any licensing authority; (2) names of all doctors, nurses, physician assistants, and mental health providers DOC employed; (3) records related to DOC medical staff practicing with restricted or suspended licenses; (4) records of prisoner deaths in 1999; (5) records of prisoner deaths where medical negligence was a factor; (6) postmortem documents regarding prisoner deaths; and (7) records of staff and prisoner assaults requiring medical treatment from 1994 through 1999.
¶ 4 On January 25 Wright made a second PDA request. Wright requested records of (1) DOC medical providers who had been disciplined or fired; (2) names of disciplined staff members, and the actions taken; and (3) names of DOC staff with arrest records.
¶ 5 On January 26 in response to the first request, DOC told PLN that it needed approximately 30 additional days to find and compile the requested documents. On February 1, in response to the second request, DOC told PLN that it again required approximately 30 additional days to find and compile the requested documents.
¶ 6 On March 8 DOC made available to PLN (1) the names of medical staff members, (2) the number of inmate deaths in 1999, and (3) the quarterly intelligence reports. DOC told PLN that it needed approximately 60 additional business days to respond to the records requests for (1) licensing actions related to DOC medical providers, (2) postmortem records concerning prisoner deaths, (3) disciplinary actions involving DOC medical providers, and (4) the names of DOC employees with arrest records. DOC also told PLN that DOC had no *319 single postmortem document concerning prisoner deaths.
¶ 7 On May 30 DOC told PLN that one document would be disclosed and that other documents would be disclosed on June 21, unless an affected staff member sought to enjoin the disclosure.[2] DOC told PLN that it did not maintain records containing formal medical findings pertaining to prisoner deaths.
¶ 8 On June 20 DOC made available to PLN 11 pages of documents concerning DOC medical employees practicing with restricted licenses. DOC also made available 1,207 pages of investigative records pertaining to disciplinary action against DOC medical staff. DOC redacted names and other identifying information for both disciplined staff and witnesses (a category in which DOC included both accusers and investigating personnel as well as others[3]) under RCW 42.17.310(1)(d) and (e). DOC redacted the names of patients, as well as terms related to the health care or medical conditions of those patients, citing RCW 42.17.312 and RCW 70.02.020.
¶ 9 On July 30 PLN appealed to DOC to reverse its June 20 decision. On August 22 DOC told PLN that DOC affirmed its decision. On September 20 PLN wrote a check for $243.60 for copying costs, but PLN erroneously wrote the check to the secretary of state. DOC notified PLN of its error. PLN wrote another check and received the documents on October 20. At this time DOC gave PLN a two-page chart showing the claimed statutory basis for redactions and nondisclosures.
¶ 10 PLN filed an action with the Thurston County Superior Court on May 11, 2001. A show cause hearing was held June 1. PLN alleged that DOC did not respond to PLN in a reasonable time and that various PDA exceptions claimed by DOC did not apply.
¶ 11 The trial court held that DOC did not violate the PDA, and the time it took to respond to PLN's requests was reasonable. The court required DOC to produce a log specifying which exemption had been claimed for each nondisclosed document or redaction. The court also stated that a second hearing could be requested if PLN and DOC could not negotiate the amount of specificity required regarding which exemption applied to each nondisclosure or redaction. PLN did not request a second hearing.
¶ 12 PLN appealed to the Court of Appeals, Division Two. The Court of Appeals upheld the trial court determination that the time in which DOC responded was reasonable and upheld DOC's redactions of names and identifying information of patients, witnesses, investigators, accusers, and the accused, as well as redactions related to patient health care. But the Court of Appeals reversed the trial court on DOC's withholding of preliminary drafts, notes, recommendations, and opinions. The Court of Appeals ordered its commissioner to award attorney fees and costs incurred to obtain the latter documents but did not order that the statutory penalty be imposed.
¶ 13 PLN petitioned this court but only on the application of certain PDA exemptions and the failure of the Court of Appeals to award a statutory penalty. The State did not cross-petition the determination that it had wrongfully withheld preliminary drafts and notes.

ANALYSIS

I. Statutory Framework
¶ 14 The PDA is a strongly worded mandate for broad disclosure of public records. Amren v. City of Kalama, 131 Wash.2d 25, 31, 929 P.2d 389 (1997). Washington's PDA requires every governmental agency to disclose any public record upon request, unless the record falls within certain specific exemptions. O'Connor v. Dep't of Soc. & Health Servs., 143 Wash.2d 895, 905, *320 25 P.3d 426 (2001). Any written information about government conduct is a public record, regardless of its physical form or characteristics. RCW 42.17.020(36); Smith v. Okanogan County, 100 Wash.App. 7, 12, 994 P.2d 857 (2000).
¶ 15 Chapter 42.17 RCW provides, "[j]udicial review of all agency actions taken or challenged under RCW 42.17.250 through 42.17.320 shall be de novo." RCW 42.17.340(3); Ockerman v. King County Dep't of Dev. & Envtl. Servs., 102 Wash.App. 212, 216, 6 P.3d 1214 (2000). Moreover, where the trial court record consists only of affidavits, memoranda, and other documentary evidence, we stand in the same position as the trial court. Progressive Animal Welfare Soc'y v. Univ. of Wash., 125 Wash.2d 243, 252, 884 P.2d 592 (1994).
¶ 16 Courts construe the PDA broadly and its exemptions narrowly. Hearst Corp. v. Hoppe, 90 Wash.2d 123, 129, 580 P.2d 246 (1978). The state agency bears the burden of proving that a specific exemption applies. RCW 42.17.340(1); Hoppe, 90 Wash.2d at 130, 580 P.2d 246.

II. Investigative Records Exemption
¶ 17 The Court of Appeals held that the names of disciplined DOC medical staff and of witnesses (including inmates involved) could be withheld from the documents "pertaining to DOC medical employees currently employed by the DOC who are practicing with a restricted or suspended license"[4] and from documents "pertaining to any DOC medical care providers that have been disciplined, fired, or otherwise sanctioned, with regards to the conduct of their duties in the provision of medical care to prisoners or staff."[5] DOC argued that the names of the disciplined employees were exempt from disclosure under RCW 42.17.310(1)(d), and that the names of "victims" and "witnesses" were being withheld under both RCW 42.17.310(1)(d) and (e). However, the Court of Appeals appeared to have relied solely on RCW 42.17.310(1)(d) to uphold DOC's refusal to release this information.
¶ 18 RCW 42.17.310 exempts certain specific categories of information from public disclosure:
(1) The following are exempt from public inspection and copying:
....
(d) Specific intelligence information and specific investigative records compiled by investigative, law enforcement, and penology agencies, and state agencies vested with the responsibility to discipline members of any profession, the nondisclosure of which is essential to effective law enforcement or for the protection of any person's right to privacy.
(e) Information revealing the identity of persons who are witnesses to or victims of crime or who file complaints with investigative, law enforcement, or penology agencies, other than the public disclosure commission, if disclosure would endanger any person's life, physical safety, or property....
RCW 42.17.310(1)(d), (e).
¶ 19 Thus, under RCW 42.17.310(1)(d) the "specific investigative records" must be compiled by a "law enforcement" or "penology" agency. PLN does not dispute that DOC is a law enforcement or penology agency or that the records in question were "specific investigative records."[6],[7]
*321 ¶ 20 The investigative record must also be "essential to effective law enforcement."[8] Again, the burden is on DOC to prove that the records are essential to effective law enforcement,[9] and the exemption must be construed narrowly.[10]
¶ 21 DOC claims part of its law enforcement "mission" is "to provide for the health care needs of the state's prison inmates." Answer to Pet. for Review at 9. DOC also claims disclosure of the names of disciplined employees and witnesses, including accusers, would endanger the safety and security of DOC's staff and inmates. Id.
¶ 22 DOC's specific factual allegations are (1) if the names of disciplined staff are released, those staff will be at risk of reprisal from inmates for the conduct that resulted in their discipline (Clerk's Papers (CP) at 1433-34, 1446); (2) disciplined staff could also be blackmailed by inmates into illegal acts, such as providing prescription medication which is not medically necessary, or into violating prison rules (CP at 1434, 1446-47); (3) disciplined staff might be subject to "ridicule, retaliation, and distrust by other staff members" (CP at 1435); (4) confidentiality of "employees or offenders involved in an investigation of staff misconduct" (all "witnesses" under DOC's classification) is necessary to investigate such misconduct because if staff and offender names were released to the public, offenders and staff would be less likely to report misconduct (CP at 1433, 1446); (5) "inmate confidential informants" of staff medical misconduct would have to be segregated from the general population and be placed in "permanent protective custody" if their names were released (CP at 1433); and (6) disclosure of the names of disciplined staff could lead to refusal by inmates to be treated by that staff person, or to potential medical staff choosing not to work in a DOC facility, both circumstances that DOC claims will result in making it more difficult to provide inmates with health care (CP at 1435, 1447-48). These claims were made in declarations by Eldon Vail, Deputy Secretary of DOC, Jane Robinson, Health Care Manager for McNeil Island Corrections Center, and Elizabeth Anderson, Health Care Administrator for DOC.
¶ 23 Some of these claims appear questionable on their face. Prevention of mistreatment of disciplined staff by fellow employees is within the control of DOC. Similarly, it is hard to see how the confidential informant or complaining inmate would be at risk from other inmates because they provided information concerning staff misconduct. And we do not believe DOC suggests inmates who complain about staff must have their identities protected so that staff won't retaliate against inmates. Preventing the latter scenario is again within the control of DOC, and the only person to whom the inmate can complain is another staff member. Thus, *322 whether or not the PDA exempts the names of complaining inmates from disclosure, it would appear to be a nonissue regarding retaliation from staff members who already know, or whose colleagues know, the identity of the complaining inmate.
¶ 24 The dissent appears to accept DOC's unsupported contention that staff will retaliate against inmates for reporting staff misconduct. Dissent at 5, 10. The dissent's approach would have the perverse result of failing to deter staff misconduct by keeping secret the identity of staff who have harmed prisoners through medical misconduct. The dissent would reward DOC's failure to prevent staff misconduct with secrecy in order to avert additional staff misconduct.
¶ 25 The other factual claims are not invalid on their face, but the validity of the factual claims, and thus whether disclosure of such names could have potentially negative effects within the prison, is not the issue. The issue under the plain language of the relevant statute is whether it is "essential to effective law enforcement" to prevent such effects. This determination turns on the definition of "effective law enforcement," or even more specifically, "law enforcement."
¶ 26 DOC claims "law enforcement" must be defined very broadly: "the legal, safe, secure and orderly operation of its prisons." Br. of Resp't (Ct.App. No. 28771-4) at 21, 23. DOC's proposed definition ignores the command of our prior case law that exemptions to the PDA be construed narrowly. Hoppe, 90 Wash.2d at 129, 580 P.2d 246. Were we to accept DOC's definition, investigations of all aspects of DOC's operations would be off limits from public disclosure and only by accepting DOC's invitation to define every activity it undertakes as "law enforcement" can we uphold the lower court. But neither providing patient care to DOC inmates nor disciplining medical employees is "law enforcement" as that term is commonly understood.
¶ 27 The PDA itself does not define "law enforcement" or state what is "essential" for such enforcement to be "effective." "Words of a statute not particularly defined are to be given their ordinary, everyday meaning." New York Life Ins. Co. v. Jones, 86 Wash.2d 44, 47, 541 P.2d 989 (1975).
¶ 28 In Brouillet v. Cowles Publishing Co., 114 Wash.2d 788, 791 P.2d 526 (1990), we turned to Black's Law Dictionary, stating that "[l]aw enforcement involves `[t]he act of putting ... law into effect; ... the carrying out of a mandate or command." Brouillet, 114 Wash.2d at 795, 791 P.2d 526 (quoting Black's Law Dictionary 474 (5th ed.1979)). We also stated that "[l]aw enforcement involves the imposition of sanctions for illegal conduct." Id. at 796, 791 P.2d 526. And the current edition of Black's Law Dictionary has an even more succinct definition: "The detection and punishment of violations of the law." Black's Law Dictionary 901 (8th ed.2004). According to these definitions the investigations by DOC into medical misconduct were not conducted for purposes of "law enforcement," and therefore the information which DOC seeks to exempt could not be "essential for effective law enforcement."
¶ 29 Brouillet supports this conclusion. Brouillet concerned a request for the release of records showing the reasons for teacher certificate revocations. This court focused on the fact that the Office of the Superintendent of Public Instruction (SPI) did not enforce law; SPI administered a school system. Brouillet, 114 Wash.2d at 795, 791 P.2d 526.[11]
¶ 30 Other cases interpreting RCW 42.17.310(1)(d) reinforce a narrow definition of "law enforcement" requiring the subject of the investigation be law enforcement.[12] In *323 Newman v. King County, 133 Wash.2d 565, 573, 947 P.2d 712 (1997), this court focused on records that would "jeopardize criminal investigations" in analyzing whether a document was essential to effective law enforcement. In Columbian Publishing Co. v. City of Vancouver, 36 Wash.App. 25, 671 P.2d 280 (1983), Division Two of the Court of Appeals focused not on the fact that a law enforcement agency was investigated, or that law enforcement personnel would have their identities disclosed, but rather that the investigation of job performance would not result in criminal sanction and thus was not essential to effective law enforcement. Id. at 30-31, 671 P.2d 280.[13]
¶ 31 DOC relies on Cowles Publishing Co. v. State Patrol, 109 Wash.2d 712, 748 P.2d 597 (1988) and Tacoma News, Inc. v. Tacoma-Pierce County Health Department, 55 Wash.App. 515, 778 P.2d 1066 (1989). Cowles was a plurality opinion in which the court held that the State Patrol could withhold the names of officers against whom internal investigations had sustained complaints, along with names of the complaining parties and witnesses in those cases. The plurality reasoned that a functioning internal investigation process was "required" for effective law enforcement. Cowles, 109 Wash.2d at 729, 748 P.2d 597. It specifically stated that "[s]uch a procedure is necessary to ensure that law enforcement officers do not abuse their authority or engage in unlawful activities." Id. (emphasis added).[14] Of course, while the malpractice of medical personnel may at times reach criminal proportions, the DOC investigations were not conducted to investigate criminal wrongdoing but as a matter of personnel administration. CP at 1447, 1450 (Vail declaration).
¶ 32 Additionally, the Cowles court focused on the fact that witnesses and complaining parties would be less likely to come forward or participate in the internal investigations if their identities were known. But this concern, as noted above, is of lower weight when the potential "retaliation" threat to participants in the process is not the threat from a rogue police officer, but from a nurse or physician's assistant, and DOC authorities have control over their institutions and the interactions between staff accused of wrongdoing and other staff members and prisoners who are complainants or witnesses.
¶ 33 As in Cowles, in Tacoma News the court adopted a narrower definition of "law enforcement" than that urged by DOC. The court made its determination based on "what information, if disclosed, would render ineffective the Health Department's enforcement of laws and regulations." Tacoma News, 55 Wash.App. at 521, 778 P.2d 1066. The Tacoma News Tribune had requested copies of written complaints relating to an investigation of the quality of the care provided by a particular Pierce County ambulance service. Although the narrow definition of "law enforcement" is most important for our purposes, it is noteworthy that the court made a detailed inquiry into the withheld information. The court allowed the health department to withhold the names of complainants and witnesses but ordered disclosure of the name of the ambulance company investigated (the subject in the same position as the DOC medical employees in the present case).
*324 ¶ 34 The dissent would focus on the role of the agency, rather than the function of the investigation. The dissent's approach conflates the "law enforcement or penology agency" prong of the test with the "essential to effective law enforcement" prong.
¶ 35 Under the dissent's reasoning, which echoes arguments put forward by DOC, no internal investigation of any facet of running a prison would be subject to disclosure. Because DOC could claim that disclosure of any misfeasance or malfeasance by prison staff could potentially affect DOC's ability to "`preserve the peace' of staff and inmates" or affect the "`secure and orderly operation of its prisons,'" all investigations which could cause the least disruption of the prison's operation would be exempt from disclosure. Dissent at 4 (quoting McLean v. Dep't of Corr., 37 Wash.App. 255, 258, 680 P.2d 65 (1984)); Br. of Resp't, supra note 12. Thus, under the dissent's view, the third prong of the test explicitly provided for in statute would be meaningless. Since the DOC alleges that all aspects of the "secure and orderly operation of its prisons" are "essential to effective law enforcement," ipse dixit all investigations of the operation of its prisons are exempt from disclosure.
¶ 36 Had the legislature determined that all investigations potentially affecting operation of a penology agency would be exempt from disclosure, the legislature would surely have used more direct language. Indeed, the legislature could have simply eliminated the requirement that records of such investigations be "essential to effective law enforcement." "Statutes must be interpreted and construed so that all the language used is given effect, with no portion rendered meaningless or superfluous." Whatcom County v. City of Bellingham, 128 Wash.2d 537, 546, 909 P.2d 1303 (1996) (citing Stone v. Chelan County Sheriff's Dep't, 110 Wash.2d 806, 810, 756 P.2d 736 (1988); Tommy P. v. Bd. of County Comm'rs, 97 Wash.2d 385, 391, 645 P.2d 697 (1982)).
¶ 37 We reject DOC's proffered definition of "law enforcement" and hold that nondisclosure is not "essential to effective law enforcement." DOC must release the unredacted investigative records.[15]

III. Health Care Information
¶ 38 DOC also redacted all references to medical information concerning inmates, including names, treatments, medical conditions, etc. The basis for these redactions was RCW 70.02.020, as incorporated into the PDA through RCW 42.17.312.[16] RCW 70.02.020 prohibits disclosure of "health care information" without the patient's written authorization. "Health care information" is defined as:
[A]ny information, whether oral or recorded in any form or medium, that identifies or can readily be associated with the identity of a patient and directly relates to the patient's health care, including a patient's deoxyribonucleic acid and identified sequence of chemical base pairs. The term includes any record of disclosures of health care information.
RCW 70.02.010(6) (emphasis added).
¶ 39 Washington courts have recognized the definition of "health care information" has "two requisites  patient identity and information about the patient's health care." Wright v. Jeckle, 121 Wash.App. 624, 630, 90 P.3d 65 (2004). On its face the statute appears *325 to allow for disclosure of information such as maladies, treatments, etc., when the identity of a patient is not disclosed or cannot be readily associated with the patient. PLN has not contested the nondisclosure of patient names or identification numbers.
¶ 40 DOC contends that such information can readily be associated with the identity of a patient. In its briefing, DOC claims that "inmates who are in close and continuous contact with each other ... would be able to associate the information to a particular inmate." Supp. Br. of Resp't at 15. However, DOC has not cited to any evidentiary support for this conclusion in the record.[17]
¶ 41 As noted, we construe exemptions to the PDA narrowly, requiring the state agency to bear the burden of proving that a specific exemption applies. RCW 42.17.340(1); Hoppe, 90 Wash.2d at 129-30, 580 P.2d 246. The DOC's blanket approach in redacting all health care information conflicts with the requirement to construe exemptions narrowly. Further, the broad mandate favoring disclosure under the PDA requires the agency demonstrate that each patient's health care information is "readily associated" with that patient in order to withhold the health care information under RCW 70.02.010(6). Where there is a dispute over whether health care information is readily identifiable with a specific patient even when that patient's identity is not disclosed, the trial court can use in camera review should it need to examine unredacted records to make its independent determination. See, e.g., ACLU of Wash. v. City of Seattle, 121 Wash.App. 544, 89 P.3d 295 (2004).
¶ 42 The Court of Appeals did not decide this issue on the statutory language. Its only comment about DOC's claims was that they were "plausible." Prison Legal News v. Dep't of Corr., noted at 118 Wash.App. 1069, 2003 WL 22332994, at *8. However, the court applied an equity/exhaustion argument to deny PLN disclosure.
¶ 43 At the end of a very confused oral argument, the trial court judge told the parties:
I see a big distinction between records entirely withheld and records redacted. And if the parties cannot agree on a process for handling those, then it can be brought back to the court and I'll consider arguments of both sides.... If you can agree, fine; if you can't, then I guess I will lead a second round of hearing to resolve the issues that you've identified that are arising out of my decision here.
Report of Proceedings (RP) at 40-41.
¶ 44 The trial court judge was not clear which "claims of exemptions" (CP at 1520; RP at 37) he was referring to in this conclusory statement, nor whether he was allowing PLN to contest specific redactions based on whether those redactions were within the scope of the trial court's general rulings on the validity of the claimed exemptions.[18] However, the Court of Appeals characterized this exchange as offering PLN an opportunity to "clarify the issue," Prison Legal News, 118 Wash.App. 1069, 2003 WL 22332994, at *8. The Court of Appeals then refused to address whether DOC "redacted more than was necessary to protect the patient's identity" when PLN "chose not to pursue it." Id.
¶ 45 The Court of Appeals did not accurately characterize the trial court's concluding offer at the show cause hearing. The trial court's statement actually appeared to give PLN an opportunity to challenge whether certain records, based on certain exemptions, *326 should have been withheld in their entirety or whether they should have been disclosed in redacted form.[19]
¶ 46 This would not have been reasonably interpreted by PLN's counsel as a chance to argue that specific health care information should have been disclosed because it was not readily identifiable with a patient. Indeed, since all such information had been redacted, along with the patient identity, it is hard to see how the PLN attorney could have discovered which information was or was not readily associated with a patient's identity.
¶ 47 PLN did not forfeit the right to contest whether specific health care information was readily identifiable with specific patients given a proper interpretation of the trial court's statement. We hold that on remand DOC must prove that each patient's health care information would be readily identifiable with that patient even if that patient's identity isn't known, given that PLN has not contested the nondisclosure of patient names or identification numbers.

IV. Statutory Penalties and Attorney Fees
¶ 48 RCW 42.17.340(4) states:
Any person who prevails against an agency in any action in the courts seeking the right to inspect or copy any public record or the right to receive a response to a public record request within a reasonable amount of time shall be awarded all costs, including reasonable attorney fees, incurred in connection with such legal action. In addition, it shall be within the discretion of the court to award such person an amount not less than five dollars and not to exceed one hundred dollars for each day that he was denied the right to inspect or copy said public record.
¶ 49 PLN, as the prevailing party in this action, is entitled to its costs and reasonable attorney fees.
¶ 50 The Court of Appeals did not award a statutory penalty or remand to the trial court for imposition of a statutory penalty. This court recently decided the PDA requires the imposition of a penalty, but the amount of the penalty (within statutory limits) is in the first instance determined by the trial court after proper consideration of the circumstances. Yousoufian v. Office of Ron Sims, 152 Wash.2d 421, 98 P.3d 463 (2004). Thus on remand the trial court is directed to determine the amount of statutory penalties.

*327 CONCLUSION
¶ 51 "Secrecy in government is fundamentally anti-democratic, perpetuating bureaucratic errors. Open debate and discussion of public issues are vital to our national health." New York Times Co. v. United States, 403 U.S. 713, 724, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (Douglas, J., concurring). Neither providing patient care to DOC inmates nor disciplining medical employees is "law enforcement" within the meaning of the PDA. Whether health care information is readily identifiable with a patient must be determined on a case-by-case basis with regard to each specific patient. Should DOC continue to claim that the health care information of certain specific patients is readily identifiable with those patients, the trial court must review those specific exemption claims on remand. We also remand to the trial court to determine the amount of attorney fees and expenses[20] for all proceedings to date plus the amount of statutory penalties.
ALEXANDER, C.J., MADSEN, BRIDGE, CHAMBERS and OWENS, JJ., concur.
FAIRHURST, J. (dissenting in part, concurring in part).
¶ 52 More than 1,200 records were produced by the Department of Corrections (DOC) in response to public disclosure requests by Prison Legal News (PLN). Clerk's Papers (CP) at 1432. Rather than withholding records at issue here in their entirety, DOC merely redacted the names of witnesses, victims, disciplined medical staff, identifying locations and dates, as well as inmates' specific health care information where inmates did not authorize disclosure. CP at 172, 1432. Far from degrading the goals of openness of the public disclosure act (PDA), chapter 42.17 RCW, DOC disclosed as much information as possible while maintaining the need for confidentiality in conducting internal investigations and the privacy rights of inmates regarding their health care information.
¶ 53 Because DOC met its burden in proving that redacted portions of records fell within the investigation exemption to the PDA, I disagree with the majority's holding to the contrary and would affirm the Court of Appeals on this issue. However, because of the limited facts presented on the health care exemption issue, I concur in the majority's decision to remand for further consideration of redacted health care information. I also would hold that on remand the trial court should assess penalties, attorney fees, and costs only for those specific instances in which the Court of Appeals or trial court on remand has determined that DOC has violated the PDA.

ANALYSIS
¶ 54 I agree with the majority that the PDA is a mandate for disclosure of public records and that courts must construe its exemptions narrowly. The PDA does not intend, however, for agencies to blindly fulfill disclosure requests without also considering competing public interests associated with their governmental roles. If such strict compliance were required, the legislature would not have created exemptions that do not require compliance in specific situations where other policy considerations outweigh the public's interest in disclosure.
¶ 55 At issue here are two exemptions: (1) an investigative records exemption, RCW 42.17.310(1)(d), and (2) a health care information exemption created by RCW 70.02.020, which is incorporated into the PDA by RCW 42.17.312. DOC bears the burden of proving that these exemptions apply. Cowles Publ'g Co. v. Spokane Police Dep't, 139 Wash.2d 472, 476, 987 P.2d 620 (1999). Agency actions taken under the PDA are reviewed de novo, and where the trial court considered only affidavits and documentary evidence, as was the case here, the reviewing court is in the same position as the trial court. Dawson v. Daly, 120 Wash.2d 782, 788, 845 P.2d 995 (1993).

A. Investigative Records Exemption
¶ 56 DOC withheld the names and identifying features of disciplined staff, victims, and witnesses under RCW 42.17.310(1)(d). RCW *328 42.17.310(1)(d) exempts from disclosure under the PDA "specific investigative records compiled by investigative, law enforcement, and penology agencies, and state agencies vested with the responsibility to discipline members of any profession, the nondisclosure of which is essential to effective law enforcement."
¶ 57 The investigative records exemption, RCW 42.17.310(1)(d), has been interpreted to require three things: (1) the information is intelligence information or an investigative record, (2) which was compiled by a law enforcement agency, and (3) protecting the information is essential to effective law enforcement. See Newman v. King County, 133 Wash.2d 565, 572-73, 947 P.2d 712 (1997)[1]; Cowles Publ'g Co. v. Pierce County Prosecutor's Office, 111 Wash.App. 502, 506, 45 P.3d 620 (2002). As the majority concedes, PLN does not dispute that DOC is a law enforcement agency. Majority at 320-21. Nor does it dispute that the records in question are specific investigative records. Id. Thus, the debate is solely over whether the information redacted is essential to effective law enforcement.
¶ 58 Resolution of this issue depends upon interpretation of the term "essential to effective law enforcement." RCW 42.17.310(1)(d). The PDA does not define law enforcement nor what is essential to make it effective. Our case law has defined "law enforcement" to involve "`[t]he act of putting . . . law into effect; . . . the carrying out of a mandate or command,'" the "imposition of sanctions for illegal conduct," and "imposition of a fine or prison term." Brouillet v. Cowles Publ'g Co., 114 Wash.2d 788, 795-96, 791 P.2d 526 (1990) (quoting in part BLACK'S LAW DICTIONARY 474 (5th ed.1979)).
¶ 59 Here, the redactions are essential to DOC's effective law enforcement. DOC is a law enforcement agency that "must enforce laws, rules and regulations within the institution so as to `preserve the peace' of staff and inmates." McLean v. Dep't of Corr., 37 Wash.App. 255, 258, 680 P.2d 65, review denied, 101 Wash.2d 1023 (1984). That duty involves the law enforcement acts of both putting law into effect and carrying out mandatory commands.
¶ 60 As attested to by DOC employees, release of the names of disciplined employees and witnesses would interfere with DOC's duty and ability to operate its prisons in a legal, safe, secure, and orderly manner. Release of such information could put disciplined staff, victims, and other witnesses at risk of physical harm or manipulation as retribution. CP at 1433-35, 1446, 1450. Disclosure of names of disciplined staff would also likely make it more difficult for DOC to maintain staff necessary to provide constitutionally mandated health services. CP at 1436, 1446-48, 1451. And perhaps most important and obvious, disclosure of the names of disciplined staff and of witnesses and complainants would likely also chill individuals from coming forward, thereby impairing DOC's future investigations of employee misconduct. CP at 1432-34, 1446.
¶ 61 The majority disregards these assertions out of hand by concluding that neither staff nor inmates could possibly be at risk of retribution because DOC has complete control over its prisons. This is a dangerous conclusion to draw considering the prison environment. DOC cannot control every act of retribution taken by inmates or, regrettably, even by its staff. As Eldon Vail, Deputy Secretary for DOC, knows, "offenders regularly retaliate against informants through violence or other means, whether or not it is a staff member or another offender." CP at 1434.
¶ 62 The majority also reasons that because employee investigations will not result in criminal sanctions, they are not part of DOC's law enforcement duties. Majority at 322. The majority then concludes that because the investigations are not themselves law enforcement, the redaction of names from the investigative records cannot be essential to effective law enforcement. Id. That conclusion is incorrect and is unsupported by the cases cited by the majority, Brouillet, 114 Wash.2d 788, 791 P.2d 526; Newman, 133 Wash.2d 565, 947 P.2d 712; *329 Columbian Publishing Co. v. City of Vancouver, 36 Wash.App. 25, 671 P.2d 280 (1983). See majority at 323.
¶ 63 In Brouillet, the Superintendent of Public Instruction and the Washington Education Association sought to withhold records regarding the reasons for revocation of teacher certificates under the investigative records exemption to the PDA. Brouillet, 114 Wash.2d at 791-95, 791 P.2d 526. Rather than explicitly holding that investigations must be for law enforcement purposes, this court essentially reasoned that withholding the records was not essential to any criminal law enforcement purpose and required disclosure. Id. at 795-97, 791 P.2d 526. The revocation of teacher certificates did not qualify as criminal law enforcement, nor did the defendants point to another law enforcement role to which the nondisclosure of the records was essential. Id. Implicitly, the superintendent and the Washington Education Association had no law enforcement role to which withholding the records was essential. See id. That is not the case here. As discussed above, DOC does have a law enforcement roleenforcing laws, rules and regulations to maintain the peace and security of its prisons. The redactions of disciplined medical staff, as well as witnesses to medical staff misconduct, are essential to the efficacy of DOC's internal investigations, an integral part of its law enforcement role.
¶ 64 This court's reasoning in Newman also did not require that investigations be for law enforcement purposes for withholding of investigation records to be essential to effective law enforcement. In Newman we held that withholding records pertaining to an open criminal police investigation was per se essential to effective law enforcement. Newman, 133 Wash.2d at 575, 947 P.2d 712. While we did state that the PDA exempts disclosure of records that would "jeopardize criminal investigations," as the majority asserts, we did not limit exemption to criminal investigation records. Id. at 573, 947 P.2d 712. We merely limited our reasoning to the facts before us. See id. Moreover, we cited Cowles Publishing Co. v. State Patrol, 109 Wash.2d 712, 728, 748 P.2d 597 (1988) for the exemption proposition which, as discussed in greater detail below, did not involve an investigation that would result in criminal sanctions. Instead, it involved a law enforcement agency's internal investigation, like the one here. Id. Thus, we did not intend to require that investigations result in criminal sanctions in order for the withholding of investigation records to be essential to effective law enforcement.
¶ 65 Likewise, Columbian Publishing did not hold that investigations must result in criminal sanctions in order for nondisclosure of investigation materials to be essential to effective law enforcement. The majority asserts that the Court of Appeals held that the investigation into the police chief's job performance "would not result in criminal sanction and thus was not essential to law enforcement." Majority at 323. But that is a mischaracterization. The Court of Appeals actually held that the City of Vancouver, who was investigating the job performance of one of its employees, was "not functioning as an `investigative, law enforcement, [or] penology agenc[y]' as the exemption requires." Columbian Publishing, 36 Wash.App. at 30, 671 P.2d 280 (alterations in original). The court then reasoned that even if the city could somehow assert that it was acting as a law enforcement agency in its supervisory role, the records were not compiled through a specific investigation intended to "ferret out criminal activity or to shed light on some other allegation of malfeasance." Id. at 31, 671 P.2d 280. Columbian Publishing is distinguishable from our case because here DOC was acting as a law enforcement agency, and its investigation was ferreting out the malfeasance of prison staff misconduct.
¶ 66 Furthermore, this court allowed the redaction of names from investigative records that were not part of a law enforcement investigation but which were essential to effective law enforcement in State Patrol, 109 Wash.2d at 728, 748 P.2d 597. There, the Spokane Police Department released documents related to internal investigations of officers for misconduct but redacted the names of officers, victims, and witnesses. Id. at 714, 748 P.2d 597. The department argued that redaction of officers' names was necessary to ensure effective internal investigations. *330 Id. In holding that such names were exempt from disclosure, the court reasoned that "[e]ffective law enforcement requires a workable reliable procedure for accepting and investigating complaints against law enforcement officers." Id. at 729, 748 P.2d 597. This court reasoned further that such internal investigations depended upon the "trust and cooperation" of the officersif officers knew that a sanctioned officer's name would be disclosed, then fellow officers would be less likely to make complaints or come forward as witnesses. Id. at 733, 748 P.2d 597.
¶ 67 This case is directly analogous to State Patrol. As were the facts there, DOC is only trying to exempt names from the records, not the entire record. Likewise, DOC has brought forth evidence that failure to redact names of disciplined medical staff, victims, and witnesses will deter individuals from making complaints in the future and, thus, will hinder similar future investigations.
¶ 68 The majority fails to make a persuasive factual distinction between State Patrol and this case. The majority asserts that here any retaliation threat to witnesses or victims is negligible because, unlike police officers, over who police departments have no control, DOC has complete control of its staff members and prisoners. Majority at 323. But if DOC had such complete control over its staff, there would be no misconduct in the first place. DOC cannot control everything that goes on in a prison 24 hours a day any more than police departments can control every police officer all the time.
¶ 69 Although PLN and the majority are also quick to discard State Patrol as merely a plurality opinion, this court had the opportunity to overrule or disavow its reasoning in Brouillet, but chose not to do so. Instead, in a unanimous opinion, the court clarified its earlier reasoning and distinguished it from the case then at hand. See Brouillet, 114 Wash.2d at 797, 791 P.2d 526. The court clarified that in State Patrol the internal investigations were not law enforcement, but that disclosure of names from the investigations would undermine the job done by the officers in the agencywhich was law enforcementby undermining confidence in the police and interfering with future investigations. Thus, State Patrol is still good law and supports a similar conclusion here.
¶ 70 Moreover, the Court of Appeals has applied the investigation exemption similarly in subsequent cases. In Tacoma News, Inc. v. Tacoma-Pierce County Health Department, 55 Wash.App. 515, 522, 778 P.2d 1066 (1989), Division Two of the Court of Appeals held that "nondisclosure of witness and information source identity is an important means of ensuring the efficacy of Health Department investigations," through which the health department enforces statutes, regulations, and rules. The court did not hold that the investigations at issue would actually result in criminal penalties against ambulance companies but that the investigations facilitated the department's enforcement of statutes and regulations. Id. at 520-21, 778 P.2d 1066. Furthermore, based on affidavit testimony, the court reasoned that disclosing the identities of sources of information would likely discourage individuals from providing information in the future, which would frustrate the investigative process. Id. at 522, 778 P.2d 1066. Similarly, in this case, disclosure of the names of victims or witnesses would likely discourage them from coming forward in future investigations due to embarrassment and/or fear of retaliation.[2]
¶ 71 Also pertinent to this discussion is Ames v. City of Fircrest, 71 Wash.App. 284, 294, 857 P.2d 1083 (1993) (citing Brouillet, 114 Wash.2d at 797, 791 P.2d 526; State Patrol, 109 Wash.2d at 730, 748 P.2d 597), *331 where Division Two of the Court of Appeals explicitly held that "records of an investigation of a law enforcement officer by a law enforcement agency may be partially exempt even if the investigation is not a `law enforcement' investigation with the possibility of criminal sanction." But the court concluded that nondisclosure was not essential to effective law enforcement because the identity of the disciplined person could not have remained anonymous even absent disclosure because of previous press releases. Ames, 71 Wash.App. at 296, 857 P.2d 1083. That is not the case herethe evidence indicates that absent forced disclosure, the identities of the individual medical staff disciplined would stay confidential.
¶ 72 The majority here need not create a requirement that investigations be for law enforcement purposes to narrowly apply the investigative record exemption and to uphold the purposes of the PDA. Allowing exemption of nonlaw-enforcement investigative materials as essential to law enforcement does not allow any action taken by a law enforcement agency to be exempt. Information must still pertain to a specific investigation, and the nondisclosure must be essential to the law enforcement duties of the agency at issue. Newman, 133 Wash.2d at 572-73, 947 P.2d 712. The majority trivializes that burden.
¶ 73 Moreover, many of the cases that PLN and the majority use to argue against application of the investigative exemption concern attempts to withhold entire records. See Newman, 133 Wash.2d at 575, 947 P.2d 712 (upholding blanket exemption of all records pertaining to an open police investigation); Brouillet, 114 Wash.2d at 790-93, 791 P.2d 526 (where a school system attempted to withhold entire documents pertaining to teacher sexual misconduct, and the court ordered release of the documents but allowed redaction of victim information); Columbian Publishing, 36 Wash.App. at 26, 671 P.2d 280 (where the city sought to withhold entire documents from The Columbian and the court ordered their release). In contrast, here DOC released numerous records pertaining to the misconduct with which PLN is interested and has merely redacted names of disciplined employees, victims, and other witnesses. See State Patrol, 109 Wash.2d at 733, 748 P.2d 597 (allowing redaction of disciplined police officers to ensure the integrity of the internal investigation process); Tacoma News, 55 Wash.App. at 521-22, 778 P.2d 1066 (allowing redaction of complainants and witnesses to ensure the efficacy of health department investigations). Disclosure of the identities of disciplined medical staff and witnesses to the misconduct are not necessary to serve the public's interests in disclosure, but instead would hinder fulfillment of DOC's law enforcement objectives. Allowing redaction of names while mandating disclosure of records pertaining to medical misconduct applies the investigative record exemption narrowly and balances disclosure with maintaining the effectiveness of DOC's investigation processes.

B. Health Care Information Exemption
¶ 74 The parties also dispute whether DOC should be permitted to redact inmates' health care information when they have also redacted inmate names and identification numbers. PLN asserts that once the names and identification numbers are removed, the health care information can no longer be linked to particular inmates. DOC argues to the contrary that given the context of a prison, even without names and numbers, health care information can readily be associated with individual inmates. However, unlike DOC's argument regarding the investigative records exemption, DOC does not sufficiently support its argument for application of the health care information exemption with affidavits or other evidence.
¶ 75 In reviewing agency actions under the PDA, this court is put in the same position as the trial court and is asked to weigh the facts de novo. See Dawson, 120 Wash.2d at 788, 845 P.2d 995. Because there are very few facts in the record for us to consider, I agree with the majority that remand for closer consideration is warranted. On remand, however, the court should consider the prison context.
¶ 76 RCW 70.02.020 prohibits disclosure of "health care information," which is defined as "information . . . that identifies or can readily *332 be associated with the identity of a patient and directly relates to the patient's health care." RCW 70.02.010(6). That definition includes (1) patient identity and (2) information about the patient's health care. Wright v. Jeckle, 121 Wash.App. 624, 630, 90 P.3d 65 (2004). PLN asserts that the redacted informationinformation pertaining to inmates' health caredoes not satisfy the identity requirement of "health care information" because DOC already redacted inmates' names and identifying numbers. Pet'r's Suppl. Br. at 13-14. According to PLN, health care information could not possibly be used to infer the identities of inmates receiving the care. Id.
¶ 77 Case law has not interpreted the definition of health care information so strictly. In Doe v. Group Health Cooperative of Puget Sound, Inc., 85 Wash.App. 213, 932 P.2d 178 (1997), overruled on other grounds by Reid v. Pierce County, 136 Wash.2d 195, 961 P.2d 333 (1998), only the name of an individual was disclosed. However, the court held that given the context of the environment in which the information was discloseda training session for medical personnel, specifically regarding how to access mental health treatment history of patientsrecipients could readily infer that the individual was receiving mental health treatment, information about his health care. Id. at 217-18, 961 P.2d 333.
¶ 78 The reciprocal of the situation in Doe is present here. Although the names and identifying numbers of inmates have been redacted because of the context of a prison and the environment in which inmates livein close proximity to one another with calculated routinesinmates could readily infer from information such as injuries, treatments, or even just dates on which such events occurred, to whom the health care information pertained. PLN puts forth only bald assertions that once the names of prisoners are removed, it simply would not be possible to link disclosed health care information to specific prisoners. Pet'r's Suppl. Br. at 13-14. Those assertions fail to consider the practical realities of a prison.

CONCLUSION
¶ 79 Because DOC satisfied the investigative record exemption, I would affirm the Court of Appeals on that issue and dissent from the majority's opinion to the contrary. But I agree with the majority's decision to remand for further consideration on the redactions of health care information. I also would hold that on remand the trial court should assess penalties, attorney fees, and costs only for those specific instances where the Court of Appeals or the trial court on remand has determined that DOC has violated the PDA.
IRELAND J. Pro Tem., and C. JOHNSON, J., concur.
NOTES
[1] Thomas Jefferson on Politics & Government (quoting 1st Inaugural Address, 1801. ME 3:322 (alterations in original)) (on digital archive at the University of Virginia, The Jefferson Literary & Debating Society), available at http://etext. lib.virginia. edu/jefferson/ quotations/ jeff1350.htm.
[2] The parties agree that the collective bargaining agreement then in place allowed affected employees to seek such an injunction.
[3] DOC, in its letter to PLN, stated: "The redacted information includes the names of the disciplined employees, the names of the inmates involved, the names of all witnesses and pronouns referring to those witnesses, identifying locations, and identifying dates. In addition, specific medical information was redacted per RCW 70.02.050." Clerk's Papers (CP) at 172-73.
[4] CP at 172, 158.
[5] CP at 173, 181.
[6] "Records are `specific investigative records' if they were `compiled as a result of a specific investigation focusing with special intensity upon a particular party.'" Dawson v. Daly, 120 Wash.2d 782, 792-93, 845 P.2d 995 (1993) (quoting Laborers Int'l Union, Local 374 v. Aberdeen, 31 Wash.App. 445, 448, 642 P.2d 418 (1982)).
[7] The Washington Coalition for Open Government (WCOG) now urges in its amicus brief before the Supreme Court a different approach from either the parties or the WCOG amicus brief before the Court of Appeals. WCOG argues that the records in the case at bar were not "investigative records" under RCW 42.17.310(1)(d). While the WCOG argument is inventive, it narrows the definition beyond plain meaning of the statutory term. This court, in Dawson v. Daly, stated:

Records are "specific investigative records" if they were "compiled as a result of a specific investigation focusing with special intensity upon a particular party." 120 Wash.2d at 792-93 (quoting 31 Wash. App. at 448). This interpretation has not been challenged by the parties. WCOG would add an element to the term "investigative records," implying the requirement that the investigation be statutorily mandated. Thus, only records of statutorily mandated "investigations" would qualify as investigative records. But the statute simply doesn't say "records for investigations mandated by statute." It says "specific investigative records compiled by investigative, law enforcement, and penology agencies ...." RCW 42.17.310(1)(d).
"[A] statute which is clear on its face is not subject to judicial interpretation ...." In re Marriage of Kovacs, 121 Wash.2d 795, 804, 854 P.2d 629 (1993). The plain meaning of "investigative" counters WCOG's argument. "Investigate" is defined by Webster's as "to observe or study closely: inquire into systematically ...." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1189 (2002). There is no element of legislative mandate in the dictionary definition of the term. Further, it would lead this court in future cases to try and determine whether an "investigation" is required by statute. This would lead to endless analysis of broad statutory grants of authority to agencies to determine whether a particular "investigation" is within the scope of such delegation. Finally, case law conflicts with WCOG's definition. Nothing in statute mandates that police departments have internal investigations divisions, yet those records were held to be "investigative records" in Cowles Publishing Co. v. State Patrol, 109 Wash.2d 712, 748 P.2d 597 (1988).
[8] DOC did not claim that the names could be withheld under the other possible exemption in this subsection, the protection of a person's right to privacy.
[9] RCW 42.17.340(1); Hoppe, 90 Wash.2d at 130, 580 P.2d 246.
[10] Hoppe, 90 Wash.2d at 129, 580 P.2d 246.
[11] The dissent's discussion of Brouillet focuses on the role of the agency, but the Brouillet majority first focused on the function of the investigation. "An examination of the term `law enforcement' reveals that certificate revocation involves neither criminal nor civil law enforcement." Brouillet, 114 Wash.2d at 795, 791 P.2d 526 (emphasis added).
[12] DOC admits that if this definitional requirement were adopted, their investigations into medical misconduct would not meet the definition. "DOC does not contend that the investigations themselves are `law enforcement' investigations, but the release of the names and identifying information of witnesses and disciplined staff interferes with DOC's law enforcement mission; namely the legal, safe, secure and orderly operation of its prisons." Br. of Resp't DOC (Ct.App. No. 28771-4) at 23.
[13] The dissent again focuses on the role of the agency, rather than the purpose of the investigation, alleging that we "mischaracterize[]" the case. Dissent at 327-28. However, the Court of Appeals in Columbian Publishing focused on the purpose of the investigation ("[t]his is purely a personnel matter," 36 Wash.App. at 31, 671 P.2d 280), in spite of the fact that the records in that case were produced by law enforcement personnel and were obviously intended to improve the functioning of the police department, a law enforcement agency.
[14] The dissent's quotation of the immediately preceding sentence in Cowles omits the Cowles court's explicit holding as to why a "`workable reliable procedure for accepting and investigating complaints against law enforcement officers'" is needed. Dissent at 330 (quoting Cowles, 109 Wash.2d at 729, 748 P.2d 597). See discussion, supra. But of note is that even were we to accept the dissent's truncated characterization, the investigation of police performing the functions of their jobs is an investigation of law enforcement. Only by accepting the dissent's and DOC's overly broad characterization of all prison operations as "law enforcement" can Cowles be seen as remotely analogous.
[15] Before the Court of Appeals, DOC also claimed that RCW 42.17.310(1)(e) provided an additional ground for refusing to release the names of "complainant witnesses." Br. of Resp't (Ct.App. No. 28771-4) at 32. The Court of Appeals, while citing the statute in its description of the parties' arguments, did not analyze the nondisclosure under this section. See Prison Legal News, Inc. v. Dep't of Corr., noted at 118 Wash.App. 1069, 2003 WL 22332994, at **5-6. Perhaps this was because DOC specified that only the names of complainant witnesses were withheld under RCW 42.17.310(1)(e), see Br. of Resp't DOC (Ct.App. No. 28771-4) at 33 n.7, and the Court of Appeals found those persons covered by RCW 42.17.310(1)(d). Neither party has analyzed this issue in its briefing before this court. On its face RCW 42.17.310(1)(e) only protects the identity of witnesses to or victims of "crime," not the medical misconduct at issue in the current case. Perhaps some of that misconduct might have risen to the level of a crime, but DOC has not identified any such misconduct.
[16] RCW 42.17.312 states, "Chapter 70.02 RCW applies to public inspection and copying of health care information of patients."
[17] DOC also claims that PLN could "cross reference" a list of deceased inmates it has been provided with medical information to determine patient identity. Supp. Br. of Resp't at 15. However, DOC does not even make a plausible attempt to demonstrate how, with only the names of deceased inmates and the descriptions of medical care provided in records of medical misconduct, it could connect the names to the maladies. Presumably a person trying to do this would already have to know the malady from which the inmate died. In any case, the additional information needed to have any possibility to connect these dots would not appear to make the identity "readily associated" with the information that directly relates to the patient's health care, as required by the statute.
[18] After the show cause hearing, DOC did produce a lengthy chart identifying the specific exemption DOC claimed for each redaction or withheld document. This was attached to the order ending the case. CP at 1526-2119.
[19] As the trial judge stated, "the parties and this court agreed that we would first address generally the availability and scope of the exemptions claimed by the Department of Corrections here without making them records specific, and we've undertaken that process." CP at 1510 (RP at 27). In response to the exemption rulings from the bench, counsel for PLN stated, "part of what we would be seeking would be a clearer relationship between these exemptions and the actual redactions made." CP at 1521 (RP at 38).

Counsel was clearly stating that a determination would have to be made as to which of the several claimed exemptionsnot just the health care exemptionthe department was applying to the redacted text. The trial court then inquired whether DOC had identified which exemptions were applied to records it had disclosed but redacted and which had been applied to records not disclosed. CP at 1521 (RP at 38). After a discussion of whether the documents were centrally located, the trial judge suggested the department identify which records were redacted or withheld under which exemptions. CP at 1522-23 (RP at 39-40). In response, DOC produced a chart. Supra note 19.
The context of this entire discussion involved categorizing redacted and withheld records according to the possibly applicable exemptions. It did not focus, as the Court of Appeals indicated, on whether documents withheld under the medical records exemption were identifiable with specific patients. And the follow-up hearing offered was to resolve whether it would be too "onerous" on DOC to identify the specific exemption applied to each record:
How onerous is it upon the defendant to be required to identify all withheld records and redactions to a specific claim of exemption? And that's to be discussed; that's one extreme. The other extreme is no identification at all other than what you've already done, and then there may be some middle ground that may satisfy folks as well. If you can agree, fine; if you can't, then I guess I will lead a second round of hearing to resolve the issues[.]
CP at 1523 (RP at 40).
The follow-up hearing was not offered specifically regarding the medical exemption, as indicated by the Court of Appeals. And since, as noted above (note 19) DOC produced a chart showing which exemption applied to which redaction or withheld record, no follow-up hearing was required.
[20] See RAP 18.1(i).
[1] The Newman court actually presents the test here as having two parts because it combines numbers (1) and (2); however, substantively the test is the same.
[2] The majority also asserts in passing that the Court of Appeals in Tacoma News was more accurate because, although it allowed redaction of witness and/or complainant names, it ordered disclosure of ambulance company names, the equivalent of the disciplined medical staff here. Majority at 323. But the majority fails to mention the distinction made by the Court of Appeals. The court there stated that unlike the situation present in State Patrol, in Tacoma News, the investigation was not a sensitive, internal investigation, which depended upon cooperation of its employees. Tacoma News, 55 Wash.App. at 523, 778 P.2d 1066. Here, the investigations at issue were confidential, internal investigations more like those at issue in State Patrol than those in Tacoma News.